UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TREVOR GUELLER,

        Plaintiff,

   v.                                                        Case No. 21-C-221

SHAWANO COUNTY, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

     Plaintiff Trevor Gueller, who was an inmate in the Shawano County Work Release Center from July 6, 2020, to October 1, 2020, brought this 42 U.S.C. § 1983 action against Defendants Shawano County, Adam Bieber, Daniel Breutzmann, Samantha Williams, Brenda Lynn, Mallory Parkos, and Brendan Barkow.  Gueller alleges violations of his constitutional rights that resulted in the physical assault of Gueller by another inmate on September 28, 2020.  He also asserts state law claims against Defendants.  The Court has jurisdiction over Gueller's § 1983 claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Presently before the Court is Defendants' motion for summary judgment.  For the following reasons, the motion will be granted and the case will be dismissed.

## BACKGROUND

     Gueller was an inmate in the Shawano County Work Release Center (WRC) from July 6, 2020, to October 1, 2020.  Defs.' Proposed Findings of Fact (DPFOF) ¶ 12, Dkt. No. 22.  Gueller was housed in the E Dorm of the WRC in September 2020.  *Id.* ¶ 53.  Adam Bieber is the Sheriff

of Shawano County and Daniel Breutzmann, Samantha Williams, Brendan Barkow, Brenda Lynn, and Mallory Parkos were employed as jailors by Shawano County. *Id.* ¶¶ 3–10.

Shawano County operates the WRC and the county jail. *Id.* ¶ 13. The WRC and the jail are located one mile apart in the City of Shawano. *Id.* ¶ 14. The WRC houses low security inmates who are employed and have been sentenced to jail with Huber privileges. *Id.* ¶ 19. It contains a series of housing units with a bunk-style setup and an open common area, referred to as the day room, with tables and a television. *Id.* ¶ 21. The WRC has five dorms, labeled A through E, that are in a fan shape. *Id.* ¶ 22. The maximum capacity of the E Dorm is 40 inmates, but the average daily population of the E Dorm during September 2020 was 15 to 20 medium security inmates. *Id.* ¶ 23.

The WRC is staffed with by two jailers—one female and one male—who are scheduled for twelve-hour shifts beginning at either 6:00 a.m. or 6:00 p.m. *Id.* ¶¶ 15–17. Jailers at the WRC do rounds every half hour. During the rounds, one jailer completes cell, bathroom, and common area checks, while the other jailer watches the surveillance cameras. *Id.* ¶ 18. There are cameras around the entire WRC, including the officer's station, hallways, desk area, kitchen, lobby, all entrances, outside, each bunkroom, the day rooms, and each bathroom. *Id.* ¶ 44. In September 2020, the E Dorm had five cameras with a total of nine points of view: (1) one camera in the day room has four camera heads to cover four different areas of the day room, (2) one camera in each of the three sleeping rooms, and (3) one camera in the bathroom. *Id.* ¶ 32. There are two video monitors at the officer's station that receive the video feed from the cameras; one monitor is located near the D Dorm and the other is located near the B Dorm. *Id.* ¶ 33. Each monitor shows approximately 50 images on one screen, including both inside and outside camera feeds, and jailers have the ability to monitor the video feed from the cameras in real time. *Id.* ¶¶ 34–35. The video

2

feeds on the monitor are grouped by which dorm the video feed originated. For example, if the video feed came from the A Dorm, all of the A Dorm views would be grouped together. *Id.* ¶ 36. The individual camera feed images displayed on the monitor are about two inches wide by two inches high, but when a camera view is manually enlarged, the other smaller views go away. *Id.* ¶ 38. Jailers can see the camera images well enough to monitor inmates and try to prevent inmate misconduct, notwithstanding the size of the images on the monitors. *Id.* ¶ 39. If a jailer views something suspicious on the video feed, the jailer can turn on the microphone to hear what the inmates are saying. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 33, Dkt. No. 37. The two jailers on duty at the WRC during each shift have a shared responsibility for monitoring the cameras. DPFOF ¶ 40. While Defendants contend that it takes approximately one minute to scan through all of the video feeds on the monitors, Gueller asserts that it can vary with respect to how long it takes to view all of the images. *Id.* ¶ 41; Pl.'s Resp. to DPFOF ¶ 41, Dkt. No. 38. Jailers are trained to watch the video feed on the monitor unless other responsibilities take them away from watching the monitors. DPFOF ¶ 42. From the male jailer station, jailers can see into a portion of the E Dorm room through the windows in the E Dorm. PPFOF ¶ 7; Defs.' Resp. to DPFOF ¶ 7, Dkt. No. 43. Jailers are trained to look through the E Dorm day room windows to monitor the inmates. PPFOF ¶ 34; Defs.' Resp. to DPFOF ¶ 34. They are also trained to look into the E Dorm day room by looking up from their desks, along with their other duties. PPFOF ¶ 35; Defs.' Resp. to DPFOF ¶ 35.

Each dorm has an intercom that allows an inmate to contact a jailer, and the intercom in the E Dorm was in the day room, near the front exit. DPFOF ¶¶ 26–28. When an inmate activates the intercom by pressing the button, the intercom sets off an alarm in the middle of the officer's

3

station and the camera feed at the officer's station switches to capture the location of the intercom activation. *Id.* ¶¶ 29–30.

Gueller was involved in a physical altercation with another inmate, Keith Wilber, on September 28, 2020, in the E Dorm. *Id.* ¶ 59. Breutzmann and Williams worked from 6:00 a.m. to 6:00 p.m. on that day and were responsible for monitoring video surveillance for the entire WRC and for completing common area checks and rounds. PPFOF ¶¶ 44–45; Defs.' Resp. to PPFOF ¶ 45. Williams and Breutzmann have no memory of anything that happened that day. PPFOF ¶ 46.

The surveillance camera footage shows that at 5:50:52 p.m., Gueller exchanged words with Wilber about food on the trays. Wilber lunged at Gueller, challenged him to a fight, and then slapped Gueller in the face at 5:51:02. Gueller asked Wilber if he felt better, and Wilber slapped him in the face again at 5:51:09 and said, "Let's go in the shower." After some feinting by Wilber, Gueller said, "Do it again, do it again." Wilber walked away, and Gueller started clapping and said, "Bravo." Wilber walked back to Gueller and they exchanged words, but Wilber walked away at 5:51:40. After this confrontation, Gueller began mopping the day room and bathroom. Wilber paced back and forth and watched the television in the day room.

At 5:56:13, Wilber and Gueller stare at each other. Gueller looked at Wilber and moved his arms in a taunting way that appeared to provoke Wilber to engage. Gueller and Wilber walked toward each other, Gueller feigned a punch, and Wilber punched Gueller in the face at 5:56:18. Wilber assumed a boxing stance, and from 5:56:22 to 5:56:30, Wilber punched Gueller in the face five times. After throwing the fifth punch, Wilber motioned with his head toward the bathroom. Wilber walked into the bathroom, and Gueller followed.

Both Wilber and Gueller are visible on the E Dorm bathroom camera at 5:56:40 and are poised to fight. At 5:56:46, they entered the shower area, and Wilber repeatedly struck Gueller until 5:57:07. Four other inmates entered the bathroom to watch the altercation, and two inmates remained in the day room. Wilber left the shower area at 5:57:21. Gueller briefly entered the day room but returned to the bathroom. The parties dispute how long Gueller remained in the bathroom: Defendants assert that Gueller went to the bathroom for 10 to 15 minutes to clean up, and Gueller asserts that he was in the bathroom for over one hour cleaning up his injuries. DPFOF ¶ 85; Pl.'s Resp. to DPFOF ¶ 85. Prior to the altercation, Gueller and Wilber did not have any disagreements of any kind. *Id.* ¶ 60. As a result of the altercation, Gueller sustained two black eyes, a broken jaw, and other injuries. DPFOF ¶ 83.

When Gueller was in the day room and the bathroom, he did not get the jailers' attention or press the intercom. *Id.* ¶ 86. When the jailers went through the E Dorm, Gueller hid in the bathroom to avoid being seen by the jailers. *Id.* ¶ 89. After Gueller left the day room, he went to the sleeping area and did not have any verbal conversations or make eye contact with any of the jailers as they came through on their rounds. *Id.* ¶ 88. When he went to bed, he was laying in such a way that his face was not visible to someone walking in, and he laid in this manner purposely to avoid being seen by the jailers. *Id.* ¶ 90. Gueller knew that he could use the intercom to speak with jailers, submit a message to the kiosk for medical assistance, and speak with jailers when they came into the E Dorm, but he never attempted to contact the jailers after the incident. *Id.* ¶¶ 113, 115, 117.

Defendants contend that Breutzmann and Williams did not hear or see the altercation between Gueller and Wilber and that nothing drew their attention to the camera view of the E Dorm day room. DPFOF ¶¶ 69–71. While Gueller does not know if any jailer witnessed the

altercation with Wilber in real time, *id.* ¶ 110, he asserts that loud sounds could be heard from the E Dorm day room, that he and Wilber used raised voices during the conflict, that the first part of the fight occurred within sight of the male officer station, and that the entire fight was visible on the surveillance monitors. Pl.'s Resp. to DPFOF ¶¶ 69–70. During their rounds, Williams and Breutzmann did not observe anything out of the ordinary in the E Dorm or with respect to Gueller. DPFOF ¶ 77.

Lynn and Barkow worked at the WRC from 6:00 p.m. to 6:00 a.m. *Id.* ¶ 55. Defendants assert that Lynn and Barkow did not observe anything out of the ordinary in the E Dorm or about Gueller, but Gueller contends that they would have observed him in the bathroom cleaning up for an hour. DPFOF ¶ 91; Pl.'s Resp. to DPFOF ¶ 91. Parkos and Breutzmann began their September 29, 2020, shifts at 6:00 a.m. and did not observe anything out of the ordinary in the E Dorm or with respect to Gueller until approximately 3:00 p.m. when Parkos first saw Gueller. DPFOF ¶¶ 92, 96. Gueller did not leave his bed for the entirety of September 29, 2020, until approximately 3:00 p.m. when he was taken to a visitation area to meet with a probation officer. *Id.* ¶¶ 97, 99. Agent Agnes DuBois observed that Gueller had two black eyes, but he did not tell her how he sustained his injuries. *Id.* ¶ 101. After Gueller's meeting with DuBois, Parkos saw Gueller's injuries, stopped him, and asked to speak with him. *Id.* ¶ 102. Gueller told Parkos that he had been in a fight the day before but refused to tell her who else was involved. *Id.* ¶¶ 103–04. After he talked with Parkos, Gueller told the jail nurse, the jail doctor, and law enforcement what had happened. *Id.* ¶ 105. Later that day, at 3:23 p.m., Gueller was placed in a holding cell at the WRC for medical observation. *Id.* ¶ 106. He received Tylenol, an ice pack, and x-rays the following day. *Id.* ¶ 109.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378–81 (2007). Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

**A. Failure to Protect Claim**

Gueller asserts that Breutzmann and Williams failed to protect him from Wilber. The Eighth Amendment prohibits "cruel and unusual punishments" and imposes a duty on jail officials to ensure that inmates receive adequate food, clothing, shelter, and medical care and to take

7

reasonable measures to guarantee an inmate's safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Supreme Court has held, however, that not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 833. To prevail on an Eighth Amendment failure to protect claim, a plaintiff must show that the jail official was "deliberately indifferent to the fact that an inmate was in serious peril of being harmed." *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006) (internal quotation marks and citations omitted). Under this standard, a jail official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Stated differently, in order to defeat summary judgment, Gueller must show that Breutzmann and Williams had some awareness that each fight was occurring and failed to take reasonable actions to protect him.

Defendants assert that Breutzmann and Williams did not know there was a substantial risk of harm to Gueller at the time of each altercation. Gueller does not dispute that he did not seek help or notify the jailers about the altercations through the intercom, by yelling, or by knocking on the officer's station window. Instead, he asserts the jailers must have known about the altercations because they were required to constantly monitor the surveillance footage and therefore must have seen the altercations on their monitors. He also maintains that a large portion of the incident would have been visible from the officer's station window. But Gueller does not know what was occurring in the officer's station at the time of each altercation, and there is no evidence from which it could be reasonably inferred that Breutzmann and Williams saw the altercation through the window or the video surveillance monitors. The jailers are responsible for monitoring approximately 50 surveillance camera feed images. Each image is about two inches wide by two inches high. Although Gueller and Wilber exchanged words for a period of time before their

8

physical altercations, the physical altercations themselves lasted only seconds at a time. In short, there is no evidence that Breutzmann and Williams actually saw or heard anything that would lead them to know that there was a physical fight occurring between Gueller and Wilber.

Gueller's argument essentially amounts to the claim that if the guards assigned to monitor the security cameras were doing their job properly, they should have seen Wilber assault him. But monitoring surveillance cameras does not mean continuously staring at them. As Jail Sergeant Mallory Parkos explained at her deposition, "You pay attention to the camaras as much as you can, but you also have other responsibilities where it's not always possible to watch cameras 24/7." Dkt. No. 21, ¶ 9, Ex. E at 13:13–14:05. Moreover, even if as Gueller contends, the guards were supposed to maintain constant surveillance, failing to do so does not amount to deliberate indifference absent some reason to believe risk of serious injury was imminent. *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("Here, Zick displayed no such strange behavior or any obvious signs that he was an imminent suicide risk."). Absent such knowledge, such failure would amount to negligence at most.

It is also worth noting that while jail staff have a duty to protect inmates "from violence at the hands of other prisoners," *Farmer*, 511 U.S. at 832–33, "an inmate cannot base a failure to protect claim on a situation that he instigated." *Wilson v. Hardy*, No. 11-C-743, 2011 WL 976558, at *2 (N.D. Ill. Mar. 14, 2011) (internal quotation marks, citations, and alterations omitted). After the first slap, which could not be stopped by the defendants even if they knew about it because it occurred in an instant, Gueller placed himself in harm's way by continuing to engage and provoke Wilber. Indeed, Gueller could have avoided further confrontation by contacting the jailers or separating himself from Wilber. Gueller cannot seek to hold the jailers liable for his own conduct. "Starting a fight or voluntarily participating in one and then getting the worst of it does not create

9

a failure to protect claim." *Lemmons v. Durant*, No. 10-3030, 2011 WL 4633104, at *3 (C.D. Ill. Oct. 4, 2011) (citing *Santiago v. Walls*, 599 F.3d 749, 768 (7th Cir. 2010)); *see also Clark v. Johnson*, 181 F. App'x 606, 607 (7th Cir. 2006) ("But the risk to [plaintiff] was of his own making, and prison officials cannot reasonably be required to protect an inmate who intentionally instigates a violent altercation with another prisoner."). For these reasons, Gueller has failed to state a failure to protect claim against Breutzmann and Williams under the Eighth Amendment.

## B. Medical Care Claim

Gueller claims that Breutzmann, Williams, Lynn, and Barkow were deliberately indifferent to his serious medical need by failing to seek medical care for his injuries. A jail official violates the Eighth Amendment when he or she displays "deliberate indifference" to an inmate's medical need. A plaintiff asserting a claim of deliberate indifference must establish two elements: "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Deliberate indifference requires that the defendant "know of and disregard an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Deliberate indifference can be inferred when a defendant knows of a substantial risk and does nothing, or when he knowingly takes ineffectual actions. *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016).

Gueller did not explicitly notify Breutzmann, Williams, Lynn, and Barkow about the fight or his injuries; did not seek medical treatment after the altercations; and actively hid from the jailers so they could not view his injuries. Nevertheless, he asserts that Breutzmann and Williams were deliberately indifferent because they failed to seek medical care for him despite knowing of the fight. But Gueller has presented no evidence that Breutzmann or Williams knew that Gueller had been in a fight, that he had sustained injuries, or that he needed medical care. Therefore,

10

Breutzmann and Williams were not deliberately indifferent to Gueller's serious medical needs because they did not know about them.

As to his claim against Lynn and Barkow, Gueller does not dispute that Lynn and Barkow did not witness the fight. Instead, he asserts that, because they are responsible for monitoring the video surveillance footage, they must have seen that he was in the bathroom for over an hour attempting to address his injuries and should have known that he required medical care. No reasonable jury could conclude that Lynn and Barkow were deliberately indifferent to Gueller's medical needs based on the fact that they may have noticed on the surveillance video monitors that Gueller spent about an hour in the bathroom in front of the sink. Again, Gueller has not presented evidence from which a jury could infer that Lynn and Barkow knew about his serious medical needs.

Breutzmann, Williams, Lynn, and Barkow did not know about Gueller's injuries. Once Parkos learned of Gueller's injuries on the afternoon of September 29, 2020, she asked him about his injuries, and Gueller ultimately was placed in a holding cell for medical observation and received Tylenol, an ice pack, and x-rays. Gueller's own conduct caused the delay in receiving medical care. In sum, Defendants' motion for summary judgment is granted as to Gueller's deliberate indifference claim.

C. *Monell* Claim

Gueller asserts a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), alleging that the County's actual policies and practices undermine its ability to monitor inmates to keep them safe. He also asserts an official capacity claim against Sheriff Bieber. As an initial matter, the official capacity claims will be dismissed because they are redundant of the claim asserted against the County. And because the individual jailers did not
11

violate Gueller's constitutional rights, there can be no municipal liability. *See Sallenger v. City of Springfield, Illinois*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be held liable under *Monell* when there is no underlying constitutional violation by a municipal employee."). Accordingly, Gueller's claim under *Monell* is dismissed.

**D. State Law Claims**

Gueller has asserted state law claims against Defendants. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). The Court follows this presumption and declines to exercise supplemental jurisdiction over Gueller's state law claims. Accordingly, Gueller's state law claims against Defendants are dismissed without prejudice so that they may be pursued in a state forum.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 20) is **GRANTED** with respect to the federal claims, and such claims are **DISMISSED**. The remaining state law claims are **DISMISSED without prejudice**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 1st day of April, 2022.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge